## DISABLED PERSONS

**BLIND INDUSTRIES AND SERVICES OF MARYLAND — APPLICATION OF DIRECT LABOR REQUIREMENTS AND PROCUREMENT PREFERENCES TO BISM — INVESTMENTS BY BISM**

May 24, 1993

*Dr. Nancy S. Grasmick*
*State Superintendent of Schools*

You have requested our opinion on certain issues of statutory interpretation related to the operation of Blind Industries and Services of Maryland ("BISM"). Specifically, you present the following questions:

1. Do the requirements for the sale of "products made by the blind" in Article 30, §30A(a) through (c) of the Maryland Code apply to merchandise or other products sold by BISM? If so, is compliance with the direct labor requirements measured on a product-by-product basis, or for a total facility?

2. Do the direct labor requirements of Article 30, §30A apply to the provision of vending machine services?

3. Does the procurement preference established for BISM in Title 14, Subtitle 1 of the State Finance and Procurement Article, Maryland Code ("SF" Article) depend upon the employment of a minimal number of blind individuals in the activity for which the preference is claimed?

4. Is the discretion of the Board of Trustees of BISM to make investments limited to the types of investments specified in Article 95, §22.

For the reasons stated below, we conclude as follows:

1. The requirements in Article 30, §30A governing the sale of products made by the blind apply to merchandise or other products sold by BISM. Compliance with the direct labor

requirements are to be measured on a product-by-product basis, rather than for a total facility.

2.	The direct labor requirements of Article 30, §30A apply to the provision of vending machine services.

3.	The employment or training of some minimum number of blind individuals in the production of goods or services is not a precondition to BISM's procurement preference under SF Title 14, Subtitle 1. BISM is required, however, to offer only those goods or services that "directly benefit" blind individuals and, in so doing, must comply with the direct labor requirements of Article 30, §30A.

4.	The discretion of BISM's Board of Trustees to make investments is not limited to the types of investments authorized in Article 95, §22.

This opinion is based on the facts available to us in an audit report and other materials. We should not be taken to have addressed any issue of compliance with the legal requirements that we outline. Nor, of course, do we comment on any of the policy questions that might be raised about the scope of BISM's business endeavors.

We are aware, moreover, of the recent controversy regarding BISM's expenditures and hiring practices. These important issues about BISM's operations go well beyond the scope of this opinion, and we take no position about them. We do observe, however, that because BISM receives both State financial support and a significant statutory procurement preference, continuing scrutiny is essential to ensure that BISM is in fact serving the interests of blind individuals in Maryland.

# I

## Background

Blind Industries and Services of Maryland is a corporation created by Article 30, §§5 and 6 to provide for the employment and training of blind citizens of Maryland. BISM receives a State educational grant in excess of one million dollars. BISM also enjoys

a statutory preference for the purchase of its supplies or services by State government.  SF §14-103(2).

As we understand it, BISM currently comprises three divisions: the Industries Division, the Rehabilitation Training Program, and the Services Program.  The Industries Division houses such diverse enterprises as industrial sewing, manufacturing, microfilming, and commercial vending services.

Commercial vending services, known as BISM Vending Services ("BVS"), were initiated in the spring of 1989.  Through BVS, BISM provides and services vending machines throughout the State.  These vending services have given rise to your questions regarding the scope of Article 30, §30A and the statutory procurement preferences.[1]


## II

### History of BISM and the Blind Vending Program

As early as 1874, the Maryland Legislature evidenced a desire to provide a mechanism for blind citizens to earn income through the fruits of their labor.  At that time, the General Assembly authorized the directors of the Maryland Institution for the Instruction of the Blind to establish workshops and open a store for the sale of articles manufactured by the blind.  Chapter 236, Laws of Maryland 1874.

The genesis of BISM may be found in legislation enacted in 1908, which established a workshop in Baltimore City for the employment of blind men and women.  This legislation vested general supervision and control of the workshop in a board of trustees.  The board of trustees was constituted a "body corporate" under the name Maryland Workshop for the Blind.  The Workshop was to be open for the labor and manufacture of all blind citizens

---

[1] The Office of Legislative Audits of the Department of Fiscal Services issued a special report on October 27, 1992 that included, among other points, recommendations that an opinion be sought from this office regarding the direct labor requirements of Article 30, §30A and the range of investments permitted BISM under State law.

over the age of 18. All profits arising from the operation of the Workshop were to be used in furthering its usefulness. Chapter 566, Laws of Maryland 1908.[2]

In 1939, the General Assembly expanded the permissible Workshop activities by providing authority for the Workshop to issue licenses to blind U.S. citizens "for the operation of stands in all State, county and municipal buildings for the vending of newspapers, periodicals, confections, tobacco products and any other articles, except alcoholic beverages." Chapter 513, Laws of Maryland 1939. The 1939 amendments also permitted a blind individual 21 years old or older to apply to the Workshop "to operate a legitimate business of any kind to provide a livelihood for himself and dependents." *Id*. Ultimately, the General Assembly designated the workshops as "training and employment centers" and changed the name of the Maryland Workshop for the Blind to "Blind Industries and Services of Maryland." Chapter 164, Laws of Maryland 1973. Hence, by 1973 the basic structure and scope of BISM's business was established.

In 75 *Opinions of the Attorney General* 189 (1990), we discussed in detail the history of Maryland's blind vending program. Briefly, we said that BISM's initial participation in the program was in response to the federal Randolph-Sheppard Act of 1936, codified as amended at 20 U.S.C. §§107 through 107f. The Randolph-Sheppard Act required the State to designate an entity to license blind persons to operate vending stands on federal property, and the Maryland Workshop for the Blind was so designated. Chapter 513, Laws of Maryland 1939. Eventually, the General Assembly authorized the Maryland Workshop for the Blind to license blind vendors operating stands on State and privately-owned property as well. Chapter 5, Laws of Maryland 1955.

In Chapter 63 of the Laws of Maryland 1958, the General Assembly transferred the responsibility for licensing blind vendors to operate on federal property from BISM to the Division of Vocational Rehabilitation ("DVR") in the State Department of

---

[2] Later legislation authorized workshops elsewhere in the State, as well as in Baltimore City. Chapter 100, Laws of Maryland 1955.

Education.[3]   Thus, while DVR licensed managers for federal vending facilities, the Maryland Workshop for the Blind licensed blind vendors for State and private facilities.

The blind vending program was reunified by the enactment of Chapter 743 of the Laws of Maryland 1980.   This legislation amended ED §21-303(c) to establish DVR as the administrator of the Maryland Vending Program for the Blind under the Randolph-Sheppard Act and also as the licensing agency for all blind vending stands in the State.

Although divested of its licensing authority over blind vendors by the 1980 legislation, BISM did not cease its participation in blind vending activities.   For approximately the next ten years, BISM served under a contract with DVR to locate, build, and staff snack bars, cafeterias, and sundry shops in publicly owned buildings and in private businesses.  This contractual relationship was terminated in 1990.

## III

### Employment of Blind Individuals Pursuant to Article 30, §30A

### A.    *Applicability of Article 30, §30A to BISM*

Article 30, §30A is essentially a truth-in-marketing law that has the dual effect of protecting consumers who purchase, and blind individuals who market, products made by the blind:

> (a) It is unlawful for any person, association, or corporation, to sell, or offer to sell, to the public any merchandise or other products of any nature, which are represented

---

[3] Amendments to the Randolph-Sheppard Act required the states to designate vocational rehabilitation agencies, rather than agencies for the blind, to administer the federal program for blind vendors. *See* Vocational Rehabilitation Amendments of 1954, Pub. L. No. 83-565, §4, 68 Stat. 663 (1954).   Pursuant to Chapter 12 of the Laws of Maryland 1992, the Division of Vocational Rehabilitation is now known as the Division of Rehabilitative Services.

to be products made by the blind, unless the merchandise or other products have been actually made or manufactured by blind persons as defined in this article. If the merchandise or other products are made or manufactured by a corporation, association or partnership, it is unlawful for such products to be sold or offered for sale to the public as products made by the blind unless they are products made by the blind as defined in this article.

(b) It is unlawful for any person, association, or corporation having products for sale to use the word blind in the name or title of the person, association, or corporation unless the person, association, or corporation limits its sales to the sale of products made by the blind as defined in this article.

(c) A product made by the blind is one which in its manufacture and assembly has involved the use of blind workers to an extent constituting not less than seventy-five percent of the total personnel engaged in the direct labor hours in the manufacture and assembly of the product. Nothing in this subtitle authorizes the identification of goods or articles as made by blind persons if the direct labor performed by blind persons in connection therewith consists solely of the packaging or packing thereof as distinguished from the manufacture and assembly of goods or articles. Direct labor hours shall include all hours in the manufacture and assembly of a product made by blind persons but not including time spent in the administration, supervision, shipping and inspection of such products.

A violation of §30A is a misdemeanor, punishable by a fine of up to $100 and, if the fine is not paid, imprisonment of up to 30 days. §30A(f).[4]

To determine whether §30A applies to Blind Industries and Services of Maryland, we look first to the language of the statute. By its terms, §30A appears to apply to BISM: BISM is, indisputably, a "corporation." It is a well-settled principle of statutory construction, however, that a statute regulating persons and corporations generally does not include the State, its agencies, or its political subdivisions unless the Legislature has clearly expressed an intention otherwise. *Nationwide Mutual Insurance Co. v. U.S. Fidelity and Guaranty Co.*, 314 Md. 131, 550 A.2d 69 (1988); *Unnamed Physician v. Commission on Medical Discipline*, 285 Md. 1, 400 A.2d 396 (1979).

BISM asserts that it is a State agency and is therefore outside the scope of the statute, because Article 30, §30A, contains no provision explicitly subjecting the State to its requirements. And it is true that an opinion of this office characterized BISM's predecessor corporation, the Maryland Workshop for the Blind, as a State agency sufficient to qualify for the administration of a State plan for federal aid to the blind. 21 *Opinions of the Attorney General* 170 (1936). *See also* 50 *Opinions of the Attorney General* 188 (1965). Yet other opinions concluded that the Maryland Workshop for the Blind was not a State-owned institution and, therefore, was neither exempt from payment of collateral inheritance tax, 23 *Opinions of the Attorney General* 616 (1938), nor exempt from compliance with the Baltimore City Building Code. 40 *Opinions of the Attorney General* 120 (1955). Later, this office advised that employees of the Maryland Workshop for the Blind were not State employees. 53 *Opinions of the Attorney General* 249 (1968). We draw from this mixed historical record the lesson that one must look to the characteristics and functions of BISM in the context of the particular statute at issue to determine whether BISM is intended to be viewed, for purposes of that statute, as a State entity.

---

[4] Although a $100 fine seems minimal, "[e]ach sale, or offer to sell, of merchandise or products in violation of the provisions of this section is a separate offense."

BISM, like its predecessor Maryland Workshop for the Blind, is a body corporate created for the general supervision and control of training and employment centers for the blind. Article 30, §6. Since its inception, the corporation has been governed by a board of trustees appointed by the Governor. The board is required to keep proper records of its funds and accounts, be audited annually, and make an annual report to the Governor, the General Assembly, and the Chairman of the Joint Budget and Audit Committee. *Id*.

Aside from these limited indicia of State control, BISM has broad powers to conduct business as would any private corporation. Under Article 30, §6(a), "BISM has the right to acquire and hold property, real, personal, and mixed, in any manner whatsoever, to sue and be sued, and to make and use a common seal, with the right to alter and change the same at any time." Similarly, BISM has "full power to establish, maintain, direct and supervise all matters pertaining to blind industries, its maintenance and regulation, including the purchase of all machinery and materials as may seem to them suitable and necessary, and the barter or exchange of articles or manufactures entrusted to them for disposal." Article 30, §6(d). It is empowered to appoint a corporate secretary and other necessary employees and to fix their compensation. Article 30, §6(b).

In practice, BISM has conducted itself much as a private entity, operating in accord with its own bylaws, setting compensation for its employees, and obtaining status as a nonprofit, charitable corporation under §501(c)(3) of the Internal Revenue Code. Although BISM receives money from the State pursuant to a grant agreement, the State is under no statutory requirement to fund BISM.[5]

Attorney General Burch described BISM's predecessor as a "semi-autonomous corporate entity." 53 *Opinions of the Attorney General* at 249. Another way to put it is that BISM is a "quasi-

---

[5] State appropriations for BISM are incorporated in the annual budget bill as monies appropriated for a "State-aided educational institution." *See, e.g.,* Chapter 8, Laws of Maryland 1993 (appropriating $1.1 million to BISM for fiscal year 1994). In fiscal years 1988 through 1993, BISM received approximately $1 million per year in State aid. In fiscal year 1992, BISM's total revenues were in excess of $14 million. Blind Industries and Services Special Report, Office of Legislative Audits, Department of Fiscal Services (October 27, 1992).

public corporation."  Quasi-public corporations are private in ownership, "'but which, nevertheless, by reason of the nature and extent of their operations and effect on the welfare of the public at large, have been styled quasi-public corporations.'"  *Potter v. Bethesda Fire Dep't*, 309 Md. 347, 357, 524 A.2d 61 (1987) (quoting 1 W. Fletcher & C. Swearingen, *Cyclopedia of the Law of Private Corporations* §63, at 600 (1983 rev. vol.)).

BISM plays an important, legislatively recognized role in providing for the welfare of blind persons.  Its activities are "'affected with a public interest ....'" *Potter*, 309 Md. at 358 (citation omitted).  In recognition of its role, BISM receives certain special privileges, like the procurement preference discussed in Part IV below.[6]  BISM, therefore, is not merely a private corporation − it is a quasi-public one.

But this label does not resolve the question whether BISM should be viewed as excluded from Article 30, §30A just as if it were a State agency.  "Not all quasi-public corporations are governmental in nature ...." *Potter*, 309 Md. at 358.  *See, e.g., Maryland & Pa. R.R.Co. v. Mercantile-Safe Deposit & Trust Co.,* 224 Md. 34, 39, 166 A.2d 247 (1960) (railroad).  BISM, despite its public welfare role, does not exercise governmental powers.[7]  Just as the Court in *Potter* held a particular statute to encompass only governmental, quasi-public corporations, a different statute might encompass only non-governmental, quasi-public corporations.

That is, indeed, our construction of Article 30, §30A.  The usual rule of construction would lead us to conclude that the term "corporation" in §30A does not encompass governmental, quasi-public corporations.  But we see no reason why the term "corporation" in this context should exclude a *non-governmental*, quasi-public corporation like BISM.

---

[6] The receipt of special privileges is a hallmark of a quasi-public corporation. *Potter v. Bethesda Fire Dep't, Inc.,* 59 Md. App. 228, 235, 474 A.2d 1365 (1984), *vacated on other grounds,* 302 Md. 281, 487 A.2d 288 (1985).

[7] As discussed in Part II above, BISM has had no licensing responsibilities since 1980.

The State and its subdivisions are ordinarily excluded from generally applicable statutes to avoid potential impairment of the State's sovereignty – "'the reasoning applicable to [citizens generally] applies with very different, and often contrary force, to the government itself.'" *State v. Milburn*, 9 Gill 105, 118 (1850) (citation omitted). BISM is not the government. Nor is BISM's public welfare role compromised by compliance with §30A. Indeed, the employment requirements of that section are entirely consonant with BISM's objective of increasing employment opportunities for blind persons.

### B.    *Compliance With the Direct Labor Requirements of §30A*

Having determined that Article 30, §30A applies to merchandise or other products sold by BISM, we turn to the question whether compliance with §30A is required on a product-by-product basis. We start with the language of the statute itself. Article 30, §30A(c) defines "product made by the blind" as follows:

> A product made by the blind is *one* which in *its* manufacture and assembly has involved the use of blind workers to an extent constituting not less than seventy-five percent of the total personnel engaged in the direct labor hours in the manufacture and assembly of the product .... Direct labor hours shall include all hours in the manufacture and assembly of *a product* made by blind persons but not including time spent in the administration, supervision, shipping and inspection of such products.

(Emphasis added.) Although the statute does not address the question specifically raised, it does refer to "product" only in the singular. *Cf.* §30A(d), (e), and (e-1) (referring to "products," not "a product"). Thus, the plain language of the statute suggests that compliance with the direct labor hours requirement must be on a product-by-product basis.[8]

---

[8] Although Article 1, §8 of the Code sets out a rule of construction that "[t]he singular always includes the plural, and vice versa ...," this rule

(continued...)

BISM contends that it need not comply with the direct labor hour requirement on a product-by-product basis, asserting instead that it need only comply with the direct labor hour requirement on an overall basis by facility. In support of this assertion, BISM cites the federal Javits-Wagner-O'Day Act ("JWOD" Act), which established a program to increase employment and training opportunities for persons who are blind or have other severe disabilities. 41 U.S.C. §§46 *et seq.* Under the JWOD Act, a Committee for Purchase From the Blind and other Severely Handicapped establishes and publishes in the Federal Register a procurement list. Any entity of the federal government intending to procure commodities or services on the procurement list must afford priority to a "qualified nonprofit agency for the blind or such an agency for other severely handicapped." 41 U.S.C. §48. The JWOD Act defines a "qualified nonprofit agency for the blind" as an agency:

> (A)   organized under the laws of the United States or of any State, operated in the interest of blind individuals, and the net income of which does not inure in whole or in part to the benefit of any shareholder or other individual;

> (B)  which complies with any applicable occupational health and safety standard prescribed by the Secretary of Labor; and

> (C)   which in the production of commodities and in the provision of services ... during the fiscal year employs blind individuals for not less than 75 per centum of the man-hours of direct labor required for the production or provision of the commodities or services.

---

[8] (...continued)
is inapplicable if inconsistent with the legislative intent underlying a particular statute. *State Tax Comm'n v. Harrington*, 126 Md. 157, 94 A. 537 (1915). As we explain below, a construction of §30A(c) that lumped all products together would be inconsistent with the purpose of the subsection.

41 U.S.C. §48b(3).

Although the JWOD Act and implementing regulations, 41 C.F.R. §51-1.3, provide a direct labor requirement similar to that set out in Article 30, §30A, the federal statute may be interpreted as permitting the direct labor requirement to be met on an agency-by-agency basis, simply because the direct labor is measured in the provision of "commodities or services," in the aggregate. Assuming for discussion purposes that such an interpretation is accurate, the direct labor provisions of the JWOD Act have no bearing on the interpretation of Article 30, §30A. By its very terms, the JWOD Act is directed only to federal agencies and only places limitations on the federal procurement of certain products made by blind individuals. Thus, there is no conflict with §30A, which provides a yardstick for measuring whether a product touted as one "made by the blind" is in fact so made for sale in this State.

Support for compliance on a product-by-product basis is found in the legislative history and structure of Article 30. Although the General Assembly has modified and expanded BISM's functions and structure over time, the nucleus of legislative intent has remained intact: the entity exists to benefit blind citizens of Maryland. It is within this context that §30A must be interpreted. Provision of goods and services necessarily involves a range of jobs. To permit compliance on a facility-by-facility basis would permit the shunting of blind individuals into lower paying, less desirable jobs while sighted individuals filled the more lucrative positions.

To give effect to what we believe was the General Assembly's objective in enacting Article 30, §30A, we conclude that compliance with the direct labor requirements of §30A must be on a product-by-product basis. If the General Assembly concludes that a different outcome is preferred, of course it may change the statute accordingly.

### C.  *Applicability of the Direct Labor Requirement to the Provision of Vending Machine Services*

As described above, BISM's "industrial" activities include vending machine services provided by BVS. The items actually sold in the vending machines are not made by the blind, but the vending service division employs some blind individuals.

Article 30, §30A(b) makes it unlawful for a "corporation having products for sale to use the word blind in the title of the ... corporation unless the ... corporation limits its sales to the sale of products made by the blind as defined in this article". Through BVS, BISM has "products for sale"; it also has the word "blind" in its title. A literal reading of the statute would thus require products sold by BVS to meet the definition of "products made by the blind" within §30A, thereby requiring blind individuals to comprise at least 75 percent of the total personnel engaged in the manufacture and assembly of the candy bars, soda, and the like sold through BVS.

Were we to apply the "plain meaning" rule of statutory construction inflexibly, we would be forced to the conclusion that BISM could never be a distributor of brand-name merchandise or provide other such services. The Maryland Court of Appeals has held that the plain meaning rule is not rigid, however, noting that "legislative purpose is critical, that purpose must be discerned in light of context, and that statutes are to be construed reasonably with the reference to the purpose to be accomplished." *Kaczorowski v. City of Baltimore*, 309 Md. 505, 516, 525 A.2d 628, 633 (1987). We must begin with "the words of the statute, read in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence." *Bane v. State*, 327 Md. 305, 308, 609 A.2d 313, 314 (1992). Hence, "we do not read particular language in a statute in isolation or out of context; rather, we construe statutory language in light of the Legislature's general purpose and in the context of the statute as a whole." *State v. Crescent Cities Jaycees Foundation, Inc.*, 330 Md. 460, 624 A.2d 955, 959, (1994).

The full context of §30A makes it obvious that the intent of the General Assembly was to permit BISM to produce both tangible items and services. Section 30A is part of a legislative scheme, dating back to the latter part of the nineteenth century, to provide employment for blind individuals. As noted in the legislative history set forth above, Article 30 provides not only for the establishment of BISM but also for the application to BISM of "any blind person of the age of 18 years or more, desiring to operate a legitimate *business of any kind* to provide a livelihood for himself and dependents." Article 30, §8 (emphasis added). Article 30 gives BISM broad powers to operate under the name of "Blind Industries and *Services* of Maryland" and directs BISM to be open for the "labor and

manufactures of all blind citizens of Maryland ...." Article 30, §6 (emphasis added). Furthermore, State procurement preferences currently found in SF §§14-103 through 14-105 were originally included as §6A and §6D within Article 30. These preferences are for the purchase of supplies and services from BISM.[9] As early as 1939, the Legislature provided BISM's predecessor, the Maryland Workshop for the Blind, with the authority to issue licenses to blind individuals for the operation of stands for the vending of newspaper, periodicals, confections, tobacco products and any other articles except alcoholic beverages.

Although blind people need not have manufactured the items sold through the vending services of BISM, we conclude that blind people must comprise at least 75 percent of the vending services personnel. Despite its longstanding recognition that BISM was producing both tangible items and services, the Legislature never excluded BISM's vending (or any other) services from the direct labor requirements of §30A. From this fact we can only conclude that the intent of the General Assembly was to encompass both tangible items and services in the terms "products or merchandise" in §30A. Indeed, given the use of the term "merchandise," which refers to goods sold in commerce, the term "products" must be taken to have a broader scope, for if it too encompassed only tangible items, one term or the other would be surplusage. To avoid that result, we construe "products" broadly to encompass services, applying the reasoning of a federal appeals court:

> In its broadest sense, the term "product" denotes anything which is produced. Since economic activity includes the rendition of services, it is appropriate, where the context otherwise permits, to refer to a completed service as a "product."

*Great Western Broadcasting Corp. v. NLRB*, 310 F.2d 591, 595 (9th Cir. 1962).

Thus, we conclude that BISM must comply with §30A in all respects, including the requirement of maintaining a 75 percent to 25

---

[9] These provisions were transferred effective July 1, 1981 to SF Title 14, Subtitle 1.

percent ratio of blind to sighted individuals in the provision of vending machine services. This conclusion gives full effect to the legislative purpose evident in the overall statutory scheme − to directly benefit blind individuals through the provision of training and employment.


## IV


### BISM's Procurement Preference
### For Vending Machine Services


SF Title 14 manifests the State's interest in promoting the welfare of disadvantaged citizens by granting supporting organizations a procurement preference. Subtitle 1 of SF Title 14 requires units of State government to procure needed products and services from either State Use Industries, Blind Industries and Services of Maryland, or sheltered workshops before soliciting public bids. Specifically, SF §14-103 provides as follows:

> The State or a State aided or controlled entity shall buy supplies and services from:

> (1) State Use Industries, as provided in Article 27, §§680 through 681M of the Code if State Use Industries provides the supplies or services;

> (2) Blind Industries and Services of Maryland, if:

> > (i) Blind Industries and Services of Maryland provides the supplies or services; and

> > (ii) State Use Industries does not provide the supplies or services; or

> (3) sheltered workshops if:

> > (i) a sheltered workshop provides the supplies or services;

(ii)  neither State Use Industries nor Blind Industries and Services of Maryland provides the supplies or services; and

(iii)  The State or a State aided or controlled entity is not required by law to buy the supplies or services from any other unit of the State government.

Title 14 does not set standards for selecting the supplies or services to which the preferences apply.  The Legislature has, instead, provided various mechanisms for that purpose.  Article 27, §681B vests general control over the goods and services offered by State Use Industries in the State Use Industries Advisory Committee and authorizes training programs for inmates to provide services and goods which are "practical and adaptable for prison industry" and "that are likely to be needed and used" by various governmental entities.  Similarly, SF §14-106(e)(2) makes the Pricing and Selection Committee for Rehabilitation and Employment Programs responsible for selecting "appropriate" supplies and services for sheltered workshops to offer for procurement.

With respect to BISM, the General Assembly instructed BISM to "revise the list of supplies and services it provides," SF §14-105, and created the Blind Industries and Services of Maryland Pricing Committee, SF §14-104.[10]  Under the statutory scheme, BISM itself decides upon the supplies and services to be furnished, and the Pricing Committee establishes the charge for these items.  This information is included on the "Master List," which is circulated to State units.[11]

---

[10] The Blind Industries and Services of Maryland Pricing Committee consists of the following four members or their designees:  the Secretary of General Services; the Secretary of Public Safety and Correctional Services; the President of Blind Industries and Services of Maryland; and a member of the Executive Board of the National Federation of the Blind of Maryland appointed by the Executive Board.  SF §14-104.

[11] COMAR 21.11.05.01.B(4) defines "master list" as "a consolidated catalog, produced at least annually, that lists the supplies and services

(continued...)

BISM's authority to decide upon services to include on the Master List is not, of course, *carte blanche*. BISM must act in accord with its statute and applicable regulations. *See Holy Cross Hospital v. Nichols*, 290 Md. 149, 428 A.2d 447 (1981). Under its statute, BISM is "a training and employment center for the blind." Article 30, §4. Its general purpose is to "be open for the labor and manufactures" of blind citizens of Maryland. Article 30, §6. By regulation, "[o]nly supplies and services that directly benefit ... blind persons ... through meaningful work experiences, occupational opportunities, vocational rehabilitation and training, and work therapy, are to be provided by [BISM]." COMAR 21.11.05.02.B. Therefore, to the extent that vending machine services "directly benefit" blind persons within the meaning of the regulation, such services may be included on the Master List, and BISM is entitled to a procurement preference for them. The regulations do not provide that a service must employ a certain proportion of blind individuals in order to meet the "directly benefit" test.

We cannot conclude that either SF Title 14 or the implementing regulations require that BISM employ any minimum number of blind individuals as a precondition to a procurement preference for the vending machine services. As discussed in Part III above, however, BISM is required by Article 30, §30A to ensure that at least 75 percent of its work force for vending machine services consists of blind individuals.

## V

### BISM's Discretion to Make Investments

The board of trustees of BISM has long had "the right to acquire and hold property, real, personal, and mixed, *in any manner whatsoever.*" Article 30, §6(a) (emphasis added). Hence, unless it is subject to some other statutory restriction, BISM's board is free to

---

[11] (...continued)
subject to procurement ..." from BISM and the other preferred suppliers. The master list indicates whether the selling entity is State Use Industries, BISM, or sheltered workshops; the fair market price; and, if the supply or service can be furnished by more than one selling entity, the ordering priority.

invest its assets (a form of personal property) prudently within the range of investment vehicles open to any corporate board.

The question is whether BISM's discretion is limited by Article 95, §22 of the Code. We think not. As we read it, §22 generally restricts the investments of the political subdivisions or bodies politic of the State, including any "public body corporate" that is itself a political subdivision or body politic. It does not apply to an entity that is not a political subdivision or body politic. This scope is manifest in the phrasing of §22(a):

> Except as provided in subsection (c) of this section and notwithstanding any provision of a local law or ordinance, the county commissioners of each county of the State, and the chief fiscal or administrative officer or officers or governing body of each municipality, town, body politic, public body corporate, school, road, drainage, improvement, construction, or soil conservation district or commission in the state, including ... the Upper Potomac River Commission, and county school boards *and other political subdivisions and bodies politic of the State and any agency of any political subdivision of the State* are hereby severally directed, authorized, and empowered [to make certain investments].

Article 95, §22(a) (as amended by Chapter 262, Laws of Maryland 1992, emphasis added).[12]

A "political subdivision" is "public and *governmental." Potter v. Bethesda Fire Dep't,* 309 Md. at 354 (emphasis added). "Bodies

---

[12] These local officials may invest "in obligations or repurchase agreements of the type in which the Treasurer may reinvest under §6-222 of the State Finance and Procurement Article, or to deposit said moneys in any bank or banks in the State of Maryland or in any savings and loan association or savings and loan associations or in any building and loan association or building and loan associations in interest-bearing time deposit and/or savings accounts, or in the local government investment pool created in this article ...."

politic" are governmental bodies or public corporations "having powers and duties *of government.*" *Hamilton County Bd. v. Professional Guild*, 46 Ohio St. 3d 147, 545 N.E.2d 1260, 1264 (1989) (emphasis added). *See also* 1 McQuillan, *Municipal Corporations* §1.19, at 21 (3d ed. 1987).

We discussed BISM's corporate nature in Part III above. While BISM serves an important public purpose as a quasi-public corporation, it does not exercise governmental powers. BISM is not a political subdivision or body politic within the scope of Article 95, §22. Therefore, BISM's board may make investments pursuant to its broad authority under Article 30, §6(a).

## VI

## Conclusion

In summary, it is our opinion that:

1. The requirements in Article 30, §30A governing the sale of products made by the blind apply to merchandise or other products sold by BISM. Compliance with the direct labor requirements are to be measured on a product-by-product basis, rather than for a total facility.

2. The direct labor requirements of Article 30, §30A apply to the provision of vending machine services.

3. The employment or training of some minimum number of blind individuals in the production of goods or services is not a precondition to BISM's procurement preference under SF Title 14, Subtitle 1. BISM is required, however, to offer only those goods or services that "directly benefit" blind individuals and, in so doing, must comply with the direct labor requirements of Article 30, §30A.

4.    The discretion of BISM's Board of Trustees to make investments is not limited to the types of investments authorized in Article 95, §22.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
*Opinions & Advice*

Margaret Ann Nolan
*Assistant Attorney General*

Gail R. Cohn
*Assistant Attorney General*